May it please the court. My name is John Wolfgang Gahart. I represent Mr. Alas, who is present with us today at the end seat there in the front row. These persecutor cases are very, very difficult, and I struggled mightily when I was doing the case in front of the judge and the BIA to put together how these cases should be figured out because there's not a lot of good guidance on how to adjudicate these cases. The Supreme Court itself had some trouble and kind of threw a wrench into the standardized analysis with Negussi. And I've already have in my briefs all of the information about the DCA and the INA and the different standards that have been applied. But at the end of the day, the problem with this case, the problem with the BIA's, the IJ's analysis, is that it just reduces to the absurd, because there is nothing that Mr. Alas could have done differently that would have pleased the BIA and the IJ. It is turning his membership in the Salvadoran National Guard into guilt by association. Well, it's a little more than that. Pardon me? A little more than membership. No, I don't think it is more than membership, because that's the reason why I have brought the law of armed conflict into my briefs, and it's a thread that runs through much of what I have done, because there has to be a standard as to how to judge the conduct of soldiers in wartime. What about this incident with the rape and murder of the female guerrilla? Yes. He was sent out to guard the perimeter. Now, the BIA and the IJ seem to think that he was sent to guard the perimeter to prevent the poor victim from escaping, but she already had half a dozen soldiers around her. She wasn't going to escape. The reason he was sent to the perimeter is to watch for enemies that might come back to the cave that they were taking down. So they could go on with what they were doing unmolested, you know, so they could concentrate on raping and murdering? Yes.  There is nothing in these records of proceedings that indicates that he knew what they were going to do. There's nothing. He never, ever said you could go through the entire whatever five inches, six inches of records of proceedings in this case, and there's nothing that shows that he knew ahead of time what they were going to do. This is a brand-new unit. He testified that it was a brand-new unit that he was made a part of. And one of the first times going out with this unit… So why can't the tire fact infer that? I mean, the five or six soldiers take this woman out, and they take her, and why can't he infer that they're doing bad things to her, they're planning to do bad things to her, or that he knew exactly what they were planning to do? Why can't the tire fact infer that from the circumstances? Because he testified that he didn't know what they were going to do. He had not been with this new unit before. There was no prior experience he had with them. And then they say, hey, go out 100 meters, guard the perimeter. He goes out. Then it's probably when they did the gruesome things that they did and raped and murdered her. But there is nothing in the record that shows that he intended to do any harm or violate any rule of the law of armed conflict. And I think that instead of having just random standards for a foot soldier's conduct, using this Court can, in essence, use this case to point administrative law judges to a standard that is useful for figuring out when a soldier's gone out of bounds and is persecuting instead of just fighting a war. Because war is gruesome. But I think what happened in this case is the judge didn't like what happened in the Salvadoran War. She didn't like the way that the Salvadoran military prosecuted the war. And she's blaming Mr. Alas for things that were completely beyond his control. When he went out and he arrested suspected guerrillas, people that were armed, violating curfew or people with whom he had just had a firefight, he turns them over to his commanders. His commanders determine what happens to those people. Do they get sent to S2? Do they get released? Mr. Alas doesn't know. Knowing, if he admits that, many of them get tortured and killed, right? Yes. But in terms of his duty as a soldier, he has a duty to arrest combatants. And the one way that Mr. Alas – I'm sorry. A soldier has a duty to turn people over to be tortured and killed? No, he has a duty to arrest combatants. No, he doesn't have a duty. I thought soldiers have a duty to resist orders that are – And he did. You see it even in the BIA's footnote in the page. When he was ordered to do things that were against the law around conflict, to take people's lives extrajudicially, he refused those orders. I see. But turning people over to other people who would kill and torture them, that's okay? Of course it's okay. It's a soldier's duty to arrest his combatants, his enemies. It's okay – look at the U.S. military. All of the insurgents that were arrested in Iraq, they were sent to Abu Ghraib prison where they were tortured and humiliated and their rights were violated. Those American soldiers were not persecutors. They're too far down the line. And even when Mr. Alas arrested someone – and this came up, I think, very briefly in the many days of hearings that we did – he didn't even know necessarily whether he actually had a guerrilla or not because there were so many infiltrators from the government acting as double agents. So he might be taking his own agent and turning it over to his commanding officer, and the commanding officer, without letting anyone know, is going to let this guy go because he's a double agent trying to infiltrate the insurgents. It's his job to make the decision as to which people should be turned over. And he said – I understand it at several points – that he knew that they were going to be killed. There were times when there was a high likelihood that people might be killed. But then again, he wouldn't even know if that particular person is even a double agent for the government that's an infiltrator. The problem is that – Nevertheless, he turned them over so that they could be killed. Not so they could be killed. He turned them over so that they could be processed, and in whichever way his commander deemed appropriate. Well, actually, I'm not sure the record quite reflects that. Well, he never turned anyone over to us directly, though. Here's what he testified to. He said, we captured two guerrillas, a man and a woman. And then what happened? The man was injured. I don't know what happened to him. I don't know if he died or what. We only took him out of the cave, but the sergeant captured a woman. We tried to use her as an example as to what can happen to the guerrillas. And it goes on. They sent us 100 feet away so we could watch the area. The other four members stayed with the woman. We were six and nine units. They raped, raped and killed her. And so he says, we tried to make her an example. I watched. They raped and killed her. Now, I realize that you could put different factual spins on it, but why isn't a fact finder entitled to say that's sufficient persecution? Because in this case, he didn't know what exactly was going to happen to that lady. We tried to use her as an example as to what can happen to the guerrillas. I don't think that that accurately represents what was going on at that moment, especially in all those many grueling hours of testimony that we did. There were lots of problems with the translation. You can take that if you like. No, I'm just asking you because that's what struck me in the record. Reading this, he says, we captured her. We tried to use her an example. They took her 100 yards away. I watched. But I think that when you look also at the cross-examination, if you go through the record further, he talks more directly about everything that happened leading up to that, after that point. And also, I think if you look at his conduct as a soldier throughout his service, because we testified many, many hours over all the things that happened to him, taking injured guerrillas on his back in a makeshift sling all the way back to a hospital. The numerous times that he was faced with doing something that he felt was ethically and morally wrong and something that he shouldn't do as a soldier, he avoided those situations. And I think that when you're judging a soldier's conduct, if he complied with the law of armed conflict and was honorable in his conduct, that what happens above him, the decisions that are made by other superiors and other agencies of the military, shouldn't filter down like a thread to hold him as a persecutor like the government is asking you to do. There has to be a much tighter relationship. And that's where I'll leave it. Okay. We'll hear from the government. Thank you, Your Honor. Good morning again. May it please the Court. The question, Your Honor, in this case, again, is more difficult than the one in the preceding case because ultimately there's no question the government met its initial burden here. The question is whether or not Mr. Alas can be held accountable for his personal conduct and whether that conduct amounts to culpable assistance in the persecution of others. Miranda Alvarado, of course, is a seminal case on this issue, and it does provide probably the clearest analytical framework for these cases. And the first question for the Court is, does the conduct amount to material assistance? And that determination requires a particularized evaluation of whether Mr. Alas had personal involvement and purposeful assistance. The minimal requirement of personal involvement is clearly met here. He admitted to seeking out, identifying, and arresting suspected guerrillas because of their alleged affiliation with the communist group, turning them over to intelligence officers for interrogation, knowing full well that they may very well be tortured or killed. He also... The government takes a position that mere membership is not enough. That's right, Your Honor. What if you, and I'm not saying this is the case here, but just generically, what if you are a member of a kind of group that systematically does bad things? Let's talk about the Gestapo. I mean, that's the sort of classic example. I mean, can you be a member of the Gestapo and say, well, I don't know what happened to them after we loaded them on the cattle cars? I mean, I don't know. I'm just asking the question. Or the Securitate in Romania. If you join a group and part of your job, it sounds like here, is to round up people, capture them, you know, and turn them over to somebody else to deal with, to what extent is there personal responsibility for what happens next if your job is to capture and turn over? Assuming that's the only conduct, Your Honor, I think it is very dependent upon the specific circumstances. Well, that's why I gave you specific circumstances, so you wouldn't have to flounder about. Your job is, you know, you are in this unit whose job it is to round up guerrillas and turn them over. Let's not talk about this, you know, the rape incident or anything. Let's talk generically about his membership in this group. It's not conventional warfare. We have less and less conventional warfare these days. Very often things involve combatants that are not in uniform and maybe civilians. You know, your job is to round them up, turn them over. Round them up, turn them over. You know that many of them will be mistreated. Where does that leave you? Well, it leaves us, Your Honor, with the specific facts of this case juxtaposed with the type of examples that you're talking about. And the fact of the matter is it's not unlikely that other members of the Salvadoran military may not be subject to the persecuted bar. Ruling against Mr. Elas in this case does not create a per se rule that simply serving in the military in El Salvador makes you a persecutor. And that, Your Honor, is the distinction between this case and cases that you're suggesting might be the same. Well, you're saying it's not simply serving in the military. But what about serving in this unit? Well, Mr. Elas was not a member of the S2 unit. He was a member of the National Guard, which, again, like the Treasury police, was recognized as a group. But I'm saying, Your Honor, that in this case mere membership is not enough. Because the difference between Judge Kaczynski's examples and this case is that there may be legitimate wartime efforts that don't rise to the level of persecution, whereas no one would pretend that the Nazis had any legitimate goal other than the extermination of the Jews. I mean, that's the difference. Oh, no, no, no. They had legitimate goals, if you want to know, other than the persecution of the Jews. They wanted to occupy Europe. They wanted to do it. They wanted Stalingrad very badly. They wanted Stalingrad very badly. I understand, Your Honor. The difference is that the means of achieving those goals. Well, what do you do in this case? Because you've got, let's take the circumstances here you have. You know, we have a lot of immigration cases stemming. And sometimes you get the immigration cases. Well, the communists tortured me. The government was unable to control the communists. The guerrillas, therefore, are entitled to asylum. And then next week, well, no, the S2 units were torturing the communists. And therefore, I mean, it's a situation where you've got some bad things that are happening on both sides of this armed conflict. How do you account for that if you're not a member of one of these groups that's actually doing the torture? Well, both the board and this court, Your Honor, have distinguished circumstances involving legitimate civil conflict where conduct does not rise to the level of persecution. Because it is, as they suggest, both incidental or ‑‑ I'm sorry, no, that's not correct. If it's directly related to ‑‑ I don't know if it's legitimate civil conflict. Is the Syrian conflict a legitimate civil conflict? Well, I'm sure, Your Honor, in the eyes of the Syrian people it is. No, I'm asking you. You know, the government's got to have a position on it. What is an illegitimate civil conflict? No, Your Honor, it's not for the government or the court to decide what side of a conflict is correct or not. No, no, I said what is a legitimate civil conflict as opposed to an illegitimate civil conflict? Well, one, I suppose, Your Honor, that simply recognizes the right of both sides to defend their position, whatever that may be. It's not whether it's right or wrong. It's just we acknowledge it just because things are pointed out. I suppose that's not the right word then. How about a civil conflict, period? Okay. That's all right. That's fine. Right. Well, so, Your Honor, my point is this. The board in the court, both in Miranda Alvarado and before, the board in Rodriguez Mahano in particular, and then again the AG in matter of age, they recognize that there are cases where you have a civil conflict and both sides have a position. Both sides are committing harm on the other. The question is, does that harm rise to the level of persecution? And generally speaking, anything that is sort of incidental to the conflict itself that may derive naturally as a consequence of that conflict may not be persecution on account of protected ground. But don't you find there's some irony in the fact that, for example, if he had been engaged in armed conflict and had killed these people on the field, on the ground, but the fact that he captures them and then they're later killed means that even though he didn't, you know, that he's barred. I mean, he takes a life in one instance and he does it in the second. I don't think that's ironic, Your Honor, because that's exactly the kind of distinction that Congress created with the persecutor bar, which is meant to simply reflect and parallel the international instruments and conventions that Petitioner so heavily relies upon. The persecutor bar is derived from the notion that people who assist in persecution and commit other crimes against humanity are not deserving of the protection of the United States. All right. So let me ask you this then. Let's assume hypothetically that he doesn't know what's going to happen at all. He just captures the people. They ask him to stay on guard, and he later learns that they were killed.  Do you think that qualifies as a perjury? Is he barred under the persecutor bar? He may not be, Your Honor, but I cannot give you a definitive answer because this Court has not recognized the scienter requirement and neither has the Board. The Attorney General has not said that knowledge is a requirement for assistance. And what I mean by that is Mr. Elassigan, his attorney, suggests that he didn't have, you know, knowledge of forethought, that he had no idea what was going to happen. And, of course, he was talking only about the rape. As you pointed out, Judge Thomas, there was no question. He admitted over and over again that he knew that they may be harmed when he turned suspects over to the S2. There's no dispute about that in the record. He focuses specifically on the rape. But because he knew that other members of the military had participated in these acts and that his conduct as part of his unit, whether it be guarding the perimeter or turning them over, may ultimately result in persecution, he cannot claim ignorance here. And so where there may be a case where the alleged... Well, that's why I gave you a hypothetical example. Understood, Your Honor. And, again, this Court has not yet recognized the scienter requirement. What's he supposed to do? What's he supposed to do? He goes out with a bunch of fellow soldiers and they capture these two and a bunch of other people and say, you go stand guard while we take care of her. What does he do at that point? Put them under arrest? What does he do? Well, it's not a question of what he's supposed to do, Your Honor. The question is whether or not his conduct amounted to assistance. And the Board isn't certainly requiring any particular acts of redemptive conduct. But how does he avoid committing an act at that point that's going to bar him from seeking a relief? Well, we could, of course, speculate about any number of ways, Your Honor. I suppose he could have resigned, or a better word might have been deserted the military at that point. But, again, there are a number of ways, whether you want to credit his allegedly redemptive behavior, he claims to have maybe taken certain suspects to a hospital and gained treatment. But it's not that the agency required him to do any number of things to sort of excuse his conduct. The question is, does that make him any less culpable? Well, no, I mean, the question really is, was he engaging in a voluntary act when he's guarding the perimeter? I mean, it's a tougher question. It is a tougher question. Particularly, you know, the transcript I read earlier talks about the sergeant capturing it. So, well, Your Honor, the voluntariness issue, of course, is an open question. It's one that the Supreme Court wrestled with in Negussie, but ultimately remanded for the Board to decide. And the AG has not yet ruled on that issue. Of course, the statute, the regulations, they do not contain an explicit duress exception. And nor does Mr. Alas suggest explicitly that one should be – I shouldn't have used that word. Excuse me. Does he – he doesn't argue expressly that one should be read into the statute, that there's an implied exception here? Because he doesn't claim that his conduct was so involuntary, you know, under duress or coercion, sort of the proverbial gun to the head scenario, that it should be excused. What his – You agree that if the only facts were – which is different from this, but it's hypothetical – he captures a guerrilla, he turns him over to somebody else and says, but, you know, you be sure not to harm him. You know, you take him to headquarters and make sure that he gets due process. It's probably taken care of. And the guy says, absolutely, don't you worry, just hand him over. We'll take very good care of him. And then as soon as he takes him over, pulls out the gun and shoots him in the head, the other guy, right? It would be – if those were the only facts, it would be hard to say that you participated in persecution, right? It might be harder, Your Honor, but it wouldn't be unreasonable. And the reason is it sort of raises two issues, whether, again, it was knowledge, whether he had some sort of contemporaneous knowledge that persecution may occur. And as Mr. Alas suggested, that somehow begs the question, what were his own personal motivations? And I think that's an inept – that's not the correct question. It's not right to suggest that if Mr. Alas did not want to persecute someone, that that somehow mattered for whether his conduct amounted to assistance. And the reason for that is Miranda-Alvarado is a perfect example, Your Honor. The Court has not hesitated, and there are a series of cases cited in our brief after Miranda-Alvarado, to hold aliens accountable for assisting in persecution where they might have objected. But then we start moving farther and farther away. I mean, there's some doubt about whether he was the one who captured him anyway, in the record, as I read it. And I realize that these are kind of muddled circumstances, but he says the sergeant captured the woman. Now, does that make a difference, if he's just a guard and he doesn't capture them and turn them over? I think it does. It may make a difference if there were not other evidence suggesting that his conduct furthered the persecution in some way. Mr. Alas would like you to think that simply guarding the perimeter was not enough to keep her from escaping. But, you know, it's not a but-for cause, Your Honor. He doesn't – his conduct doesn't have to be the only reason that that particular victim was persecuted. And, again, you have the other evidence, his direct testimony saying that he did turn people over to the S2 unit, arrested them, detained them, turned them over for interrogation, knowing that they may very well be tortured or killed. And, again, the question is, does that amount to assistance? Did it somehow further the persecution in some way? And I know that's difficult because, again, these cases present these line-drawing questions, and it's hard to find someone to be subject to the bar when you know that they're not the persecutor-in-chief. But Miranda Alvarado explicitly says it doesn't require trigger-pulling. It may have to go beyond mere assistance. But in order to assist or participate in persecution, he need not be the person who, in this case, cut the woman's throat or raped her or subjected her. Well, he wasn't. We know that. He didn't commit any acts of persecution. That's obvious from the record. Right. I mean, otherwise, he would be the persecutor bar, not the assistant in persecution. I mean, the difficult thing is I don't know how in armed conflict you can draw meaningful lines when somebody's not a persecutor. And I take your point. There's a difference between armed conflict and human rights violations, certainly. Okay. Thank you. Thank you, Your Honor. I think you have close to four minutes, three minutes and 59 seconds for rebuttal. Thanks. One of the things that's, I think, also important as you're questioning the government counsel, and it comes up in Miranda-Alvarado also, is legitimate military operations, even if they go awry because of some soldiers losing their humanity and not following the laws of armed conflict as they should, they have a different quality to them than when people are targeting an innocent group. In this case, Mr. Alas can, in essence, defeat the inference of being a persecutor. And I think he did when he testified that he had no personal motives against the guerrillas. And that's one of the things that this Court has held, that persecution has to be on account of a protected ground. And being a combatant is not a protected ground. Taking up arms, you lose your protected status. Mr. Alas even testified that he knew guerrillas. They were his friends. This was a civil war, brother against brother, in essence. And his friends were guerrillas. He even helped, he testified, build a house. I don't see how that helps you. I think it helps, because if he didn't have any personal motive to harm guerrillas, if he wasn't going out trying to search for people... That's sort of like some of the disciples saying, oh, we need Jews, some of our best friends were Jews, and then you go out and persecute other Jews. No, I don't think that that's the case, because the Jews were an innocent group. Mr. Alas is coming into contact with people who are shooting at him, who are breaking curfew, running around with guns, who are, in essence, fighting him. Nobody complains about him shooting back or engaging in combat. It is the capturing and turning over to people who he knows, he has good reason to suspect, are going to torture and kill. And specifically in the one incident where he knows that his confederates are going to teach them a lesson by taking it out on this one woman. Yeah, but in those circumstances, Your Honor, if he doesn't have an impermissible motive when he's turning people over, I want them to get persecuted, I want them to be hurt, I think that absolves him because he's not persecuting anyone, even if you think that the things that are awful. Where do you get the impermissible motive from? Pardon? Where does the impermissible motive requirement come from? When the impermissible motive is harming them by the mere fact that they have a different critical opinion. I know what you're saying. I know what you're saying by impermissible motive. I'm saying where does the requirement come from? What are you citing? What authority? Oh, even Miranda Alvarado, you cite even this in your immigration law treatise. An applicant may meet his burden by presenting evidence that the actions required legitimate criminal prosecution. I'm sorry, what treatise did I write? What treatise did I write? I didn't know I wrote a treatise. Oh, the Ninth Circuit's immigration law treatise that it publishes every year and keeps online for everyone to follow because you have so many immigration cases that come before this. There's no treatise, there's an outline of cases. Yes, an outline of cases in one of the cases. What is it specifically? I mean, the outline of cases is no better than the cases themselves. What case are you citing? Miranda Alvarado. Where? At 930. It's page B80 of your immigration law treatise. Actions were part of legitimate criminal prosecutions that were not tainted, even part by impermissible motives pertaining to a protected grounds, see Miranda Alvarado, 449F3rd at 930. And I think that the on account of the... I'm sorry, I'm looking at 930. Where are you? Where do you find it? I'm sorry, I'm reading from your treatise. I don't have the actual case in front of me. But I... A treatise is not authority. Cases are authority. I mean, where is it in Miranda Alvarado's requirement of bad motive? Well, it's in the definitions of the INA. It's persecution on account of a protected ground. And I challenged the government and I even challenged the court. What is the protected ground that these combatants have? He's a soldier. He's arresting people. He's doing what his job is. He's trying to protect the Salvadoran public from harm. If he doesn't have a motive to harm these people and he's just doing his job, then he should be found to be a persecutor. Just following orders. He's doing his job. He's protecting the public. He's serving his country. That's not enough as a defense if you persecute somebody. But he wasn't ever persecuting anyone. But it's not enough to say he's just doing his job. But it's certainly a different situation than when you have the Nuremberg trials and the defendants are saying, I was just following orders. Yeah, well, that's what you just said. He's not going after anybody based upon an innocent trait that's a protected ground. He's going after combatants. That's the difference. If he were going after innocent supporters of the guerrillas, like what happened at the massacre at El Mosote, where they killed innocent civilians just because the town was friendly to guerrillas, then sure as heck, that's a persecutory act. I think we understand your position.  Thank you.
judges: Kozinski, Reinhardt, Thomas